And we'll move on to the final case for today, Whitford. Good morning, Your Honors. I'm Aris Montes for Plaintiff Makiapi Whitford. With the Court's permission, I'd like to reserve three minutes for rebuttal. Very well. Thank you, Your Honor. Makiapi Whitford is an enrolled member of the Blackfeet Nation and a devout follower of Native religious practices that he's followed his whole life and that his tribe has followed since time immemorial. Yet Mr. Whitford has been unable to practice some of these religious tenets because Montana State Prison requires six months free of disciplinary infractions, what we call the clear conduct policy. I want to begin by pointing the Court's attention to three specific errors in the District Court's opinion. And when these legal errors are corrected, Mr. Whitford clearly prevails. So first, the District Court made a fundamental error in applying RLUIPA's basic framework considering Mr. Whitford's disciplinary history in the substantial burden analysis. When case law across the circuits makes clear that this information is only appropriately considered in the compelling interest and least restrictive means prongs of the analysis. And second, and perhaps most glaringly, the District Court failed to hold defendants to their exceptionally high burden of showing that there is a compelling interest and especially that this is the least restrictive means to achieve that compelling interest. I thought you said that his record would be relevant to that question. To the compelling interest. Disciplinary record. Yes, Your Honor. It is an important consideration. I think there's reasons to question. Animated the District Court's decision. I mean, the District Court spent a lot of time talking about his murder convictions, the fact that he's stabbed other inmates, assaulted correctional officers, has 181 disciplinary violations. I mean, this is not somebody we're going to allow to sort of wander around the prison grounds. Right, Your Honor. And so I think where the District Court erred there is in analyzing in the substantial burden prong. It is, again, important in the compelling interest. But even there. But the District Court thought that that was dispositive, did it not, of the compelling interest, that that was a sufficient justification to establish the fact that we have to keep this guy under very restrictive conditions or he's going to hurt people. Yes, Your Honor. And so addressing the compelling interest issue there, I want to make clear that the defendants didn't do an individualized assessment into Mr. Whitford's disciplinary history as the reason why his religious rights were restricted. It's a blanket policy that applies. But they've got him in the high security area of the prison for that reason, do they not? And they don't want him mixing with the low security side of the prison. Right. But he still has access to group services, including sweat lodge set up and I'm sorry, sweat lodge itself and pipe ceremony itself. And so he's able to engage in these group settings.  Yes, Your Honor. And there haven't been any powwows on the high side. No. And that's an alternative that Mr. Whitford provides that the defendants don't engage in at all. Let me ask you a more practical question. What kind of injunctive relief can the court afford Mr. Whitford now that he is in the custody of the New Jersey Department of Corrections? Right, Your Honor. And, you know, we appreciate this court's opinion that the case is not moved after the defendants filed a motion to dismiss. And so for that reason... But that doesn't answer the injunctive relief component. I mean, he may still have a claim for damages, which is one of the reasons why we decided it was not moved. But I want to answer to my question on injunctive relief. Right. And so, you know, I think that there is every reason to believe that Mr. Whitford will be returned back to Montana State Prison because of... To be released or because he... Because the New Jersey can't control. Well, there is a question in New Jersey's letter about the transfer. They do reserve the right to transfer him back to Montana State Prison. If it becomes a major problem for them, they're going to ship him back to Montana, right? Right. Technically, he's still in the custody of the Montana Department of Corrections. Exactly. Under the Interstate Corrections Compact, Montana has control and custody of Mr. Whitford. And so part of that statute also allows that all benefits and rights conferred from Montana can be benefited by the individual in whatever state that they are in. So are you asking for an injunctive... an mandatory injunction that tells the Montana Department of Corrections that they have to get the New Jersey Department of Corrections to hold powwows at whatever facility he's being held in New Jersey? Well, there is a supportive case law that has showed that some benefits can be conferred to the standing state. Is that one of the things that you want the court to... I'm trying to get some idea here of what relief is practical and what relief you want the court to afford if you win. Right. And I think the scope of relief can be a question for the district court, much like... I'm asking you now, what are you going to ask the district court if we send it back? What do you want the district court to do? I think it would be appropriate to remove the overall restriction, which is the clear conduct policies on these specific rights that burden Mr. Whitford's... How is that not mooted by the fact that he's in New Jersey? I mean, there's nothing in the record that suggests that New Jersey even addresses Native American rights. I have no idea whether they have any Native American inmates in New Jersey. I'm guessing probably not as many as we have in Montana. Yeah, that's definitely true. And well, because Mr. Whitford is still under the custody and control of Montana, Montana cannot continue to violate Mr. Whitford's religious rights. And so he will have the opportunity to... To do what? I'm still not getting an answer to my question. What do you want the court to do? Well, I think that there's an opportunity for Mr. Whitford to engage in additional dispositive motions for the ability for him to request to be sent back. And then the... Oh, so you want a mandatory injunction ordering his return to the state of Montana? Well, that's a request that Mr. Whitford can engage in. It would be separate from this. Is that what you're going to ask the district court for? I think that would be a serious consideration for him to be... Because it is an ongoing religious rights violation in the transfer and their decision to transfer him in this moment, especially in the middle of briefing and the concerning nature of the transfer, the ongoing religious rights violations in the transfer. But that required the district court then to sort of reapply the analysis on the compelling interests that... Let's say that the district court decides, as it did the first time around, that he's a very dangerous inmate. And for that reason, and that that was the prominent reason why he was moved out of Montana to New Jersey. Are you asking the court to basically look over the shoulder of the warden and make a different security classification? Do we have the authority to do that under RYLUPA? Well, there is some case law that brings challenges based off of transfers that added to religious rights violations. For example, in Jackson... Do you think Supreme Court authority would allow a federal district court the authority to do that? To second guess a security classification decision and say, well, it may be dangerous to house this guy in Montana, but you got to bring him back because you interfered with his RYLUPA rights. Well, I think that there would be additional fact finding there to really determine what was the reason for the transfer. And if there was a concern about First Amendment retaliation, if there was a concern about this ongoing RYLUPA violation, I think there is sufficient authority for the district court to order him to come back. How is the prison that he's in now? You know? In New Jersey State Prison. Yeah. New Jersey? Yes, Your Honor. Well, I thought what was left was kind of like a declaratory judgment. If he ever came back, that this is what the Montana people would have to do. Yes, exactly. That's an option for the district court to order is to ensure that it's clear that the Montana state system violated Mr. Whitford's religious rights. And I thought that's what you were essentially asking from us to direct the district court to do if he's not. That would be the effect of it. Yeah. And I think that that would be an appropriate remedy here. And so, you know, turning to the district court's errors in the reasoning again, the district court failed to hold defendants to the very exceptionally high burden of showing that they considered and rejected alternatives. Mr. Whitford presented a number of alternatives that the defendants didn't even mention in any of their briefing and summary judgments. So that included looking to the Washington Department of Corrections, which allows all of these religious rights that he seeks without any sort of restriction on disciplinary issues and allows even more services than the Montana state prison does. Is there anything in the record that was presented to the district court in terms of how the Washington Department of Corrections is set up and what their facilities look like as compared to? There is nothing on the record, but that is the defendant's burden to undergo, you know, an analysis into what are the security interests that Washington has. Is it the same as Montana? Simply on Mr. Whitford's assertion that when I was incarcerated in Washington, they were able to accommodate me. Is that enough? I believe so. I mean, I think where the district court cited war soldier as well, another case in the circuit where the plaintiff looked to other Department of Corrections and asserted that other policies have the ability to have long hair, which was the assertion that the plaintiff wanted to practice that religious right to have their hair long. And that was sufficient for them to investigate that policy in those different Departments of Corrections to see if it was an available option. And so the defendants didn't, you know, again, didn't even mention the Washington Department of Corrections in any of their supportive material. They didn't look to his ability to go to a powwow on the high side. They continuously asserted that he is not able to go to the powwow on the low side. I think there's reason to question some of their reasons to deny that as well. But even just looking at his ability to go to the high side, they did not grapple with that alternative whatsoever. There's some other, you know, common sense alternatives that they could have considered. For example, considering whether the restriction can be lessened to like one month, perhaps, you know, three months. Could it depend on the security, the issue of the disciplinary and how serious of a security issue it is? They didn't consider any of these kind of common sense alternatives. And so for that reason, there's no question that it was an error for the district court to simply just defer to the defendant's overall compelling interest when Holt v. Hobbs was very clear that if there are other lesser restrictive means, then the defendants must take it. And so that alone is a reason and likely the clearest way for this court to reverse. Would you address quickly how some of these things that he was not able to do actually burden his religious observance? Yeah, of course. So a substantial burden has been defined in Johnson v. Hobbs as a ban, a prohibition, an undue delay, you know, even an uncertainty to practice. And so... But he was allowed to go to all the actual ceremonies and the observances. These things were kind of ancillary to that, were they not? Well, and I think that that was one of the district court's error. It kind of asserted that it was an inconvenience that he couldn't go to these other practices because he had access to all these services. But really, that would be questioning the centrality of... Setting up the sweat lodge, is that...? Yeah. So setting up the sweat lodge is part of the sweat lodge ceremony itself, as Mr. Whitford believes it to be. And I think that that's pretty common for tribal practices. And you can see how that's supported in the Washington Department of Corrections. They don't have any sort of division between sweat lodge setup and sweat lodge ceremony. And so it was on the defendants to really show why there is a compelling interest to divide the sweat lodge setup and sweat lodge ceremony, and why to limit it to only four people. You know, there's a question of, can it be expanded to more people? And if it's not divided, then obviously anyone else can kind of engage in this ceremonial practice. And so it's important to look at the specific individual religious practice as alleged, and not look into the overall context of the native religious practices, and kind of like an umbrella category. With pipe carrying, again, it was... Mr. Whitford wants to be eligible to be considered for pipe carrying. And now the clear conduct policy just prevents him from being eligible and to be considered by his community to become a pipe carrier. And he has a long practice of being a pipe carrier, and that's why it burdens his religious practice. And the pow wows, they haven't had any pow wows on the high side, is that correct? So how is it a burden? Right. So there's no ability to have a pow wow on the high side. And the defendants only, you know, consider his ability to have a pow wow on the low side. There has never been one on the high side, and so he's just hasn't been able to engage in one in over 10 years. And the district court made an error there to just say that because no pow wow has been scheduled, that there is no burden. But that's exactly why the practice is burdened. But isn't the problem that there aren't enough... A, nobody's offered to do it, and there aren't enough qualified inmates who have a clean enough disciplinary record on the high side to warrant a pow wow? I think that is a question. And Mr. Whitford raises the possibility of it being overly restricted on people on the high side in general, because only two out of 20 people, I think, in one of the pipe ceremonies identified as being six months free, disciplinary free. And so... That's not enough to have a pow wow. I believe that two people perhaps would not. It's usually like a larger community setting. And so, I mean, it is a question. It is a factual question that I think there isn't clear evidence on if there would be sufficient people now. But at least if the clear conduct policy were removed, then there would be an ability for individuals on the high side. You want the clear conduct policy eliminated altogether? Oh, I'm sorry. I mean to Mr. Whitford in particular. And there's the ability for him to go to pow wow on the low side if there isn't enough people who can engage. You really do want the court to look over the shoulders and second-guess the security decisions that were made here? Well, I think that there's a reason to question the compelling interest here, because the clear conduct policy is arbitrarily applied to the compelling interest that they claim. Because Mr. Whitford, again, can engage in these kind of communal spaces where there's more of a... The court found that the problem was that Mr. Whitford can't follow the rules and won't follow the rules and is dangerous. And so that's why he can't keep himself out of trouble for six months. Right. So I want to be clear again that that wasn't... There was no individualized assessment into his violent nature to... He's got a declaration that lays that all out as the concern that the prison officials had about trying to accommodate his requests. Well, if that's the concern, it's a bit confusing why they would allow him to go into these more communal settings where there's more of an opportunity to engage in perhaps contraband or... Court looked at that evidence and then said, I'm not going to second-guess and interfere with the prison's decision on security issues. And I think there's pretty good Supreme Court authority that says that federal judges should not be doing that if the prison official can articulate a legitimate safety concern for a regulation. I see that I'm over time. So that is true in terms of the overall idea of deference, but it's also been highly limited in Holt v. Hobbs in the Supreme Court's opinion there, where of course there are important security interests, but courts are required to really look into the compelling interest to ensure that that is what was informing the decision and that there is sufficient evidence and detailed evidence has been required. What more do you want to put into the record on that issue? I mean, the prison official says, this is this guy's record. These are all the problems that we've had with him. He can't keep his nose clean for more than a few days, apparently, before he offends again. What additional evidence would you require the prison to offer to justify second-guessing the warden on that issue? Well, I think that the evidence that would be required would be the evidence to support the overall policy. And that's where there is a mismatch in terms of what they are saying and the evidence that they're providing. But you're saying that they didn't do it on an individualized basis, but they did with Mr. The important time period there is the compelling interest has to be at the time that they're applying the restriction. And here, what is kind of triggering the restriction is the overall policy. It's not an individualized assessment into Mr. Whitford's disciplinary issues. I'm not sure I understand. You're not suggesting that the disciplinary problem had ceased. I mean, as I read the record, it's an ongoing problem with this guy. Am I wrong? Did I misunderstand the record? Well, I mean, I think there is a Mr. Whitford's disciplinary issues have improved over the last few years. You know, in the past few years, there's been a handful of disciplinary issues. It's been a lot more in the previous years. And so in that situation, there would be a question of can there be more, you know, can they permit him more to engage in these religious practices that he's able to do? And that's why the overall policy is so restrictive is because it's an automatic trigger, no matter how big or how small the disciplinary is. And it's a restriction for half of a year. So that is and, you know, if someone gets another, perhaps, you know, insignificant, not insignificant, but he's been involved in some I mean, murders, assaults on correctional officers, other inmates, basically violent conduct. And I'll grant I'm sure out of 181, there are a lot of what I would call fairly nominal rules violations. But there's some pretty serious stuff here. Sure, Your Honor. And again, that's just not how the policy was considered and the reason why they Why do you say that when we have declarations from prison officials saying that this was taken into consideration in responding to Mr. Whitford's request? I mean, again, I'll reiterate that he can go to these group services and the defendants don't really explain why these other religious practices are an additional security concern. They don't explain why the setup is different than the sweat lodge itself, or why pipe carrying where there's less people is different than the pipe ceremony itself. And so they're required to explain that. And they just failed to beat their burden. We've had you up there for a long time. We'll give you a little break. Thank you, Your Honor. But we'll give you three minutes for rebuttal, okay? Good morning, Your Honors. Blake Comins on behalf of the state of Montana. The district court here found that the clear conduct policy did not violate the appellant's rights under the Religious Land Use and Institutionalized Persons Act. And this court should affirm that holding for two reasons. The first is that the clear conduct policy is fundamentally different than many of the policies that this court and other circuits have found to be violative of our LUPA. And that fundamental difference involves the nature of what that policy requires. The second is that even were this court to find that in one or more instances our LUPA did place a substantial burden on Mr. Whitford's rights, the district court was correct that the clear conduct policy is the least restrictive means by which Montana State Prison can effectuate the compelling interest of prison safety, safety of guards, safety of other inmates. I'll begin with the substantial burden. This court has recently stated in Jones that a substantial burden occurs when a prison policy places substantial pressure on an adherent to change their behavior and to violate their beliefs. And that second part, I believe, is the most important part for distinction between in our LUPA violation type policy and the clear conduct policy. What the clear conduct policy requires is that an inmate have six months of clear conduct to engage in some activities. Clear conduct is general rules of the prison, general rules of behavior. In cases like Jones, cases like War Soldier, cases like Holt that we've been talking a bit about here today, the policies at issue in those cases were they required prisoners to fundamentally violate their religious tenets. So War Soldier involved hair length. It was a hair length restriction required the prisoner there to trim his hair. Holt similarly was a facial hair restriction required inmates to shave their beard to a certain length in violation of their very specific religious practices. The clear conduct policy prohibits things like assaulting other inmates, prohibits things like theft, like dubious behavior. It is general rules of the prison and nothing in the clear conduct policy would require Mr. Whitford to violate his religious beliefs if he were to follow it. Nothing in that policy requires him to go do or not do anything to go against his religion. In that way, the clear conduct policy is just fundamentally different than most other policies where this court has found our loop of violations. And that's true across the circuits. I think a case that was raised in briefing is the Loveless case. And that case, similarly, out of the Fourth Circuit, it involved a restriction on an inmate who wanted to observe fast for Ramadan. He broke fast and the prison said, well, you broke fast and so you can't have this special diet anymore. So there's a litany of cases in this circuit and others regarding facial hair, grooming policies, food policies. And that is the fundamental type of case that brings about an our loop of violation. And it's not present here. I'd briefly say, of course, that there are some cases that I think is referred to in the case law as an outright ban. And the district court here found that there was possibly an outright ban on Mr. Whitford's ability to participate in drum practice group. Generally, the outright ban type cases are also different than the clear conduct policy in that there's not a time limit set. The outright ban in the case of, I'm sorry, I'm blanking on the case, but it's in the briefing. It involves full restrictions on maximum security prisoners. You're a maximum security prisoner. You can't take part in these activities at all. The clear conduct policy is just fundamentally different than that. Montana State Prison allows inmates in restricted housing, what would commonly be referred to as maximum security, to participate in these activities. The clear conduct policy only requires that they follow prison rules for at least six months without infraction. Judge Tallman, I'd like to just on that point briefly mention something you you had said that perhaps some of Mr. Whitford's violations were nominal rules violations. And in the record of this case is the Montana State Prison's infractions list, the minor and major infractions. Even for minor infractions, things like not showing up for work on time, you know, I guess you could say fraternizing type things. In the context of the prison, in the context of needing to trust inmates to behave themselves when they're not being supervised, even a nominal infraction, something that we might think of as one of the things that Mr. Whitford has been infracted for was conspiracy to assault guards. So not showing up where you're supposed to be on time, talking to people you're not supposed to be talking to, that is very different in the prison context than it is in the real world. That goes, I think, also to what the district court found was important in this case, and that is deferring to prison officials, giving prison officials a wide bit of deference when they're determining policies for behavior and when something is appropriate. Well, I'm not sure I'm understanding your argument. Are you saying that so long as the policy relates to prison discipline, that the prison can do whatever it wants in saying that an inmate cannot engage in any religious observances? I'm not, Your Honor. Well, what are you saying? What I am saying is that this court's precedents, there is a fundamental difference in sort of policies that have been found to be violent of our lupa, and I think that's laid out pretty well in Jones when the court said that a policy violates our lupa when it requires an adherent to do or not do a thing that is fundamental to their religious belief and would force them to violate their religious belief. Here, Mr. Whitford has not alleged that anything in the clear conduct policy forces him to do a thing or to not do a thing that would be violative of his religious belief. But it's preventing him from engaging in activities that he says are fundamental to his religious beliefs. I think that that's right, and I think that, well, that's definitely right. That's correct. And, you know, the state would concede that that's correct. But I think that— You say that that's outside of the lupa somehow? I think that that is not how this court talked about what a substantial burden is in Jones, and that's why I highlight the second part of the way this court defines substantial burden in Jones, because in Jones it said a policy will be a substantial burden if it forces an adherent to a thing and violate their beliefs. Nothing in the clear conduct policy touches on that second part, which is an important part, we believe, because that really gets at the core of how the policy interacts with the religious beliefs. To my second point, were the court to find that one or more of Mr. Whitford's religious beliefs are substantially burdened by the clear conduct policy, the court should nonetheless affirm, because as the district court found, the clear conduct policy is the least restrictive means by which it can achieve the compelling interests of prison safety. Did the district court discuss that? I think it—so which part, Your Honor? Whether it was the least restrictive means. It did, and certainly not as in-depth as maybe in other cases or as other parts of this, but it did— Well, he says there are other prisons where they don't have these restrictions at all, and the district court didn't discuss that at all. Now, why isn't that a problem? I believe that the district court did discuss that with regards to the—if I'm recalling to have a personal pipe, which is not an issue with this case anymore. I think that, as Ms. Montes discussed, the district court did consider, and Montana State Prisoner's testimony in the record regarding some of these other issues like the ability to participate in drum practice group and the heightened security risks that come along with that at Montana State Prisons, Montana State Prisons' interest in separating high-side, low-side inmates at all times, and I think that the district court certainly gave broad deference to the—to Montana State Prisons' reasonings here, but there was testimony in the record about why Montana State Prisons feels Mr. Whitford is a particular security risk, why the clear conduct policy is necessary, and I'm taking to understand that Washington doesn't require anything like the clear conduct policy, and that's how Montana used to be, and there's testimony in the record about that. I believe that comes from the affidavit of Terry Stefalo. That wasn't working in Montana. That led to the types of behaviors that are trying to be prevented by the clear conduct policy, things like gang-related activity, things like assaults, things like theft, contraband transfers at these outdoor activities that involve a lot of inmates in one place at one time, and so Montana was, as Washington has been described here today, and it didn't work, and so in response to that, Montana adopted the clear conduct policy, so the state would agree that there's not a lot of evidence in the record that a specific policy like Washington was considered and rejected, but it's implicit in sort of how this policy came to be, and I think the district court picked up on that when it said that this justification and the policy passes muster here. I'd briefly just like to clear up. I think there is testimony in the record, and this I believe is from the affidavit of Ms. Reich, that when the drum practice group, sweat lodge setup, pipe setup, those are they're different activities than the actual, not the actual because we would concede that they are all part of the religious activities, but the ceremony itself. When inmates are setting up the tent, there is less, there's not as many guards there, they are less observed, they have to work together outside of the presence of restrictions like guards. It is, the prison has found that those settings in particular are opportunities for misbehavior, and so they need to know that they can trust the inmates who are participating in those activities. If there's no other questions from the court, I would ask the court affirm the district court. Thank you for your time. Thank you, counsel. So I just quickly want to address a few things mentioned, excuse me, by my friend on the other side, and want to clarify the definition of the substantial burden under the RLUIPA analysis, and that that definition comes from Johnson B Baker, a decision by this circuit that held that the substantial burden is defined by a substantial delay, a prohibition on practicing that religious right, or uncertainty to practice. And so it's not in this restricted way that the defendants are trying to frame a substantial burden. And any way that you look at it, even if you look at it as a held that even a 10-day delay is enough of a substantial burden to, on someone's religious practices, so six months. The court engages in a balancing, correct, of whether or not the state has a compelling interest to justify the substantial burden, and here the state proffered security concerns, which the district court credited as the justification for the clear to us. Yes, it is a balancing consideration, but I want to stress that the case law in this circuit and in sister circuits have held pretty unanimously that even when individuals have heightened security levels or disciplinary issues, that it's not a sufficient reason to deny religious rights. We see that in Green Bay, Solano County, in this circuit, in Green Hill v. Clark, in the fourth mentioned, but failed to mention that they held there that there was a substantial burden based on the disciplinary that was received. But this does strike me as being different from the typical cases that we see here, the haircutting, the kosher foods, the anointing of the sacred oils. That seems to me to be something that can be reasonably accommodated, but here he's asking essentially for more freedom than he gets on the high security side in circumstances where there are more opportunities for misconduct because there are fewer correctional officers and the inmates are working in areas that are not as well surveilled as other parts of the prison. So why is that not a countervailing compelling interest to outweigh the substantial burden? Well, in all of these cases that I mentioned in Green Hill, Lovelace, they were all situations where, especially in Green, where there was a maximum security prisoner who, because of his underlying criminal conviction, the defendants tried to assert that he was a danger to be around other people as well as because everyone on that unit was in maximum security. And there the court held that even though that could have been a compelling interest, there were still lesser restrictive means to achieve that compelling interest. And that's, again, where there's a fundamental error here because the defendants did not consider... But is that a factual error by the District Court to which we apply the clear error standard or a mixed question of law and fact or a pure question of law? I think that, well, the District Court didn't make a finding on these last two prongs for the three practices that they granted summary judgment on the substantial burden prong, so the District Court could undergo an analysis there in terms of a dispute of fact. But because the defendants, they had ample time to address the alternatives and they just did not address it at all, then it could just be a law as applied to the facts that are given it. And so, again, and Mr., I'm sorry, my friend on the other side mentioned that there was evidence on the record that Montana State used to be like the Washington Department of Corrections. I don't believe that that was actually in the record. I think that the defendants in their affidavit said that they are generally concerned about, you know, the general concerns of most prisons, which is that there could be assaults, you know, trafficking of drugs and those kinds of things, but just generally asserting those security interests is not enough under a LUPA standard. An affidavit that addresses specifically Mr. Whitford and why they're concerned about giving him more freedom than he otherwise gets. And there is a pretty hefty record there of very serious misconduct up to and including murder. And again, I'll just, you know, refer back to those cases that is very clearly established across the circuits that even in those situations where there are those concerns, even given that compelling interest that they might have, they still have to show that they consider the lesser restrictive means and they just did not do that. They did not mention the Washington Department of Corrections at all and engage in that analysis about what... a more general evaluation, would it not? Because that would be a prison-wide policy in Washington. Here, they're laser focused on one inmate and whether or not the clear conduct policy is the least restrictive means to accommodate the legitimate concerns for security. Right, and they didn't consider any alternative whatsoever. They didn't, you know, even consider some of the common sense considerations of if there's a serious disciplinary issue that comes up, perhaps this amount of time period is necessary. But what if there is... What more does the state need to show? I mean, 181 violations, stabbing of inmates, assaults on correctional officers. He's doing 60 years for a murder outside the prison. I mean, this is a really difficult inmate to house. Well, the case law is clear that at the very least, the defendants are required to show that they considered any lesser restrictive means that they knew of throughout the proceedings. And so, at the very least, they should have considered what Mr. Whitford presented and shown that that was not possible. And so, for these reasons, we request the court to reverse the district court's holding and grant summary judgment in favor of Mr. Whitford. All right. Thank you both for your briefing and argument in this case. I especially want to thank Ms. Montes and Ms. Novak. Thank you very much for representing people like this in this case. You're not doing it for the money, so I appreciate you stepping up. And with that, this matter is submitted and we're done for today, and we'll be back tomorrow at 9 o'clock. Right, Kathy? All rise.
judges: SCHROEDER, TALLMAN, OWENS